

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MRG/JRS/GN  *271 Cadman Plaza East*
F. #2018R01858  *Brooklyn, New York 11201*

April 18, 2024

By ECF

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Tyshawn Corbett
                 Criminal Docket No. 20-213 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter in advance of the sentencing in the above-captioned case, which is currently scheduled for May 9, 2024 at 11:00 a.m. Following a two-week trial, a jury in this District convicted the defendant of leading a violent gang called the Elite Assassin Millas ("E.A.M.") that terrorized the neighborhood of East New York, Brooklyn and beyond. As proven at trial, the defendant ran the gang, shot at and disabled an individual, conspired to kill others, and distributed narcotics. For these reasons, and the additional aggravating factors set forth below, the government submits that a sentence within the Guidelines range of 35 years' to life imprisonment is appropriate in this case.

      I.    <u>Background</u>

      On June 18, 2020, a grand jury sitting in the Eastern District of New York returned an Indictment (the "Indictment") charging the defendant with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) ("Count One") and possessing a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c) ("Count Two"). The charges stemmed from his leadership of E.A.M., a set of the Bloods street gang based in Brooklyn, New York.

      On February 2, 2023, a jury convicted the defendant of both counts in the Indictment. (Dkt. 324.) At trial, the government called 22 witnesses, including cooperating witnesses, and introduced more than 200 exhibits including but not limited to physical evidence, surveillance video, crime scene photographs, audio recordings, text messages, and social media evidence, among other things. The facts set forth below are taken from testimony and evidence

introduced at trial and are consistent with the facts set forth in the United States Probation Department's ("Probation") Presentence Investigation Report ("PSR"), dated June 16, 2023.

        A.       The Offense Conduct

The defendant was the "boss" or "Godfather" of E.A.M. As the boss of E.A.M., the defendant committed and was involved in numerous shootings and acts of violence, narcotics distribution, frauds, and other criminal activity which were proven at his trial in United States v. Smothers, No. 20-CR-213 (KAM) ("Smothers"), as described further below.

The trial evidence proved, among other things, that: (1) E.A.M. was a violent street gang operating in Brooklyn, New York; (2) the defendant held a leadership role in the gang; and (3) the defendant agreed with others that he and other members of E.A.M. would engage in racketeering acts, including murder and attempted murder, narcotics distribution, and fraud, in furtherance of the gang.

        1.       Racketeering Conspiracy

At trial, the government introduced overwhelming evidence that E.A.M. existed and that the defendant was a key member of the gang. Cooperating witnesses John Warren and Andrew Campbell testified at length about the gang; its purpose, internal structure and hierarchy; E.A.M.'s role in the overall Bloods gang structure; the locations where E.A.M. members operated; and the criminal methods utilized by E.A.M. members to control other members and financially support and contribute to the Enterprise. Both cooperating witnesses also testified that at various times between 2006 and 2019, the defendant served as the "godfather" or "big homey" (i.e., the highest-ranking individual) of E.A.M. Tr. 259, 1074. In 2019, the defendant rose in the ranks to become the "godfather" of New York Bloods (the Bloods nation that oversaw E.A.M. and other sets). See Tr. 1078, 1100-01. As Warren, who grew up and rose through the ranks of E.A.M. with the defendant, described, the defendant became the "biggest that you can be" and was "the one that's in control of the whole Elite Assassin Millas." Tr. 259. The defendant had the power to, among other things, promote members within E.A.M. to positions of authority (Tr. 1079-80) and "push the button," i.e., order members to commit acts of violence or perform other tasks for the enterprise (for example, sending Campbell to drive to Attica to relay messages between the defendant and another high-ranking E.A.M. member) (Tr. 1085, 1106-1110).

Members of the gang, including the defendant, agreed to commit two or more racketeering acts (namely acts of murder, attempted murder, conspiracy to commit murder, drug trafficking, credit card fraud, and fraud involving means of fake identification), in order to defend and protect their territory and make money to financially benefit members and the gang. Both Warren and Campbell testified that from the start, they and other members of the gang were expected to wage war and use violence against their rivals. For example, Warren testified:

        Q:       So when you joined E.A.M., did you know you might have to commit violent acts on behalf of the gang?

        A:       Yes, I did.

> Q: Other than what you just described, how did you know that?
>
> A: It's part of the culture. The things that I've seen before I became Blood, I've been associated with Bloods before. I became Blood so I seen violence dealing with the Bloods and I know you have to be tough and do some things to be Blood.
>
> . . . .
>
> Q: When other members joined besides you, did they know they might have to commit violent acts on behalf of the gang?
>
> A: Yes, they did.
>
> Q; How did they know that?
>
> A: It's part of our oath. We let them know that, you know, you live by this AK, you die by this AK. Saying that when it's time to go, we're going to die by the gun, we're going to use the gun.

See Tr. 277-78. Campbell confirmed the same, explaining that E.A.M. members were expected to "put in the work," including "hurting someone if necessary, or . . . trying to get your name up, being tough, standing your ground when you need to, handling your beef with somebody if necessary." See Tr. 1116-1117. The consequences for not "putting in the work" were serious — members could get kicked out of the Bloods, beaten, or otherwise disciplined. See id.

E.A.M. members were expected to make money through criminal means, such as engaging in credit card fraud and drug trafficking activities and financially contributing to the gang — criminal methods that the defendant not only knew about but explicitly endorsed. Members were expected to throw money into the "kitty" (EAM's "money system") so that the gang could, among other things, buy drugs and weapons, pay bills for members who needed financial assistance and send money to members who were incarcerated. See Tr. 261, 1169-70. The defendant actively encouraged members to continue engaging in credit card fraud and drug trafficking activities to further the gang. For example, Campbell testified:

> Q: Was there any discussion at meetings for E.A.M. about how to make money?
>
> A: Oh, yeah, yeah. There was a universal in Queens, a universal in Queens in a garage.
>
> Q: When did this meeting take place?
>
> A: I don't really -- I would say like -- I would say like -- it was cold, so I would say like going in, like, the fall of '18, going into the winter.

3

> Q: Who was at this meeting?
>
> A: Chucky, Smilez, me, Buck.
>
> Q: What, if anything, did Chuck say at this meeting?
>
> A: Well . . . there was one point in the meeting where he was just stating that . . . we gotta get money as a whole, got to stay in the circle. He was, like, if you do credit cards, if you do credit card fraud, then you deal with credit cards . . . . If you sell bud [marijuana] or whatever you selling, you could deal with that lane.

See Tr. 1168-69. The defendant decided where the money in the "kitty" ultimately went and was the recipient of the funds in the "kitty" when he himself was incarcerated. See Tr. 1170-71.

The government also proved that the defendant and other E.A.M. members not only agreed to commit the specified racketeering acts in furtherance of the gang, but they in fact committed these crimes. For example, Warren admitted to selling crack cocaine and marijuana and engaging credit card fraud. See Tr. 280, 575. Campbell testified that he sold marijuana and engaged in credit card fraud. See Tr. 1112, 1167. And both witnesses described the acts of violence they engaged in to protect and defend E.A.M. and its members. Warren, in particular, testified at length about shootings and attempted murders he committed and/or participated in to retaliate against rivals of E.A.M. and its members. See, e.g., Tr. 320-330 (Warren testifying about shootings arising from gang disputes against the Montauk and Linwood street gangs); Tr. 630-656 (Warren testifying about his shooting of Kayne Harris and the circumstances leading to this shooting); Tr. 1112-14 (Campbell testifying about acts of violence he committed because an EAM member asked him to).

Other members of E.A.M. committed the same crimes. Tyshawn Corbett, one of the co-defendants in this case and a long-time E.A.M. member, similarly engaged in credit card fraud and sold marijuana and crack cocaine. See GX 714 (bag of fake credit cards seized from Corbett's storage locker); GX 719 (crack cocaine seized from Corbett's car). Corbett murdered an individual known as "Nitty" because he (Corbett) believed that Nitty killed a beloved E.A.M. member OG Black, and also shot at and paralyzed "Premo" because he and other E.A.M. members believed that "Premo" ordered the murder of OG Black, and at Kayne Harris, also known as "Fresh" over a gang dispute. See, e.g., Tr. 486-88, 582-85; GX 726 and GX 730 (firearms seized from Corbett).

The defendant not only directed violence and narcotics distribution but participated in it himself. He sold crack cocaine and marijuana to make money, supplied crack cocaine to other E.A.M. members to sell, and defended the gang and his drug turf using firearms and violence. See Tr. 295, 629, 1160-61. Warren testified that the defendant sold drugs from, among other places, Ashford Street between Liberty Avenue and Glenmore Avenue, also known as "A-Block," and that he (Warren) and the defendant kept firearms on A-Block for "protection" and to defend against "anybody that try to violate us, try to come to our block, [and] sell[] drugs." See Tr. 301-303, 612. Jail recordings between Warren and another E.A.M. member from 2018 (prior to Warren being

4

indicted and arrested in this federal case) corroborated Warren's testimony. For example, one contemporaneous jail recording captured Warren and other E.A.M. members discussing how the defendant was still in charge of A-Block and how people could not sell drugs in that area without the defendant's permission. See GX 407E; Tr. 610-11.

The evidence demonstrated how in 2011, the defendant attempted to murder Damian Bullock, also known as "Hex," by shooting him seven times over a drug robbery dispute, causing Bullock to lose a leg. Although Bullock perjured himself at trial,[1] there was ample evidence — beyond the incredible nature of his testimony — proving that the defendant did, in fact, shoot Bullock. Warren testified that the defendant admitted that in 2011, the defendant shot "Hex" due to a drug dispute. Specifically, in 2011, the defendant's right-hand man "Dooley" robbed an individual who worked for "Nuke." Tr. 469-471. At the time, "Nuke" was part of the rival Fulton street gang. Id. Bullock, who had been selling drugs together with Nuke came over to A-Block to retaliate against Dooley for the robbery. Id. The defendant, in response, shot Bullock multiple times at close range. Id. Warren further testified that after the shooting, Bullock had his leg amputated. Id.

Bullock testified from a wheelchair as a result of having been shot multiple times by the defendant. Moreover, the evidence included numerous contemporaneous statements that Bullock made, at the time he was shot and in the months following his shooting. In all of his pre-trial statements, some of which he made under oath to a Kings County grand jury, Bullock consistently identified the defendant as his shooter. See, e.g., GX 400 (911 call from Bullock identifying "Chucky" as the shooter); Tr. 1008 (Officer Joseph Nicosia testifying that when he responded to the crime scene, Bullock said that "he was shot by Chucky"); GX 600 (Bullock's identification of the defendant as the shooter in a photo array); GX 3500-DB-4 (Bullock testifying in 2011 before a state grand jury that the defendant shot him seven times); GX 3500-DB-6 (Bullock testifying in 2012 before another state grand jury that the defendant shot him and had tried to intimidate him into not cooperating with law enforcement authorities).

The attempted murder of Damian Bullock was not the only act of attempted murder the defendant committed in furtherance of E.A.M. The evidence further demonstrated how the defendant conspired to shoot at members of the Montauk crew in retaliation for the Montauk crew shooting at E.A.M. members. See Tr. 460-461. In addition, Warren described how he and the defendant conspired to murder Kayne Harris, also known as "Fresh," in connection with a gang dispute that arose between E.A.M. and Harris (who was part of the Pitkin street gang) in 2018. See Tr. 580-590, 648-49, 656-659.

At trial, Warren explained, in detail, how the dispute between E.A.M. members and Harris escalated between June and July 2018, and how the defendant became involved in this dispute. In June 2018, co-defendant Tyshawn Corbett and Harris shot at each other after they got into a fight about a music video. See Tr. 586-589. After this incident, while Warren and Harris were incarcerated at Rikers, Warren ordered Harris to get beaten up because "Fresh violated by

---

[1] On March 27, 2024, the defendant was arrested in connection with an indictment charging him with perjury and obstruction of justice based on his intentionally false testimony in Smothers.

5

shooting at a friend of mine and also . . . an EAM member." Tr. 600-02. The rivalry worsened after Harris was released from Rikers in July 2018. On July 11, 2018, Warren and the defendant attended a party, where the two saw Harris. Tr. 632-34. Warren and the defendant left the party shortly thereafter, and as they were departing in their cars, Harris shot at the car the defendant was sitting in. See Tr. 636-38. After the shooting, the defendant and Warren wanted to retaliate against Harris and kill him. See Tr. 636-640. Warren testified:

> A: Chucky was watching Fresh's page.
>
> Q: Did he tell you why?
>
> A: He was trying to figure out where he about at or where he was going so he would catch up.
>
> Q: Did you agree with the defendant that one of you would murder Fresh?
>
> A: Yes, sir.
>
> Q: Did there come a time when you shot Fresh?
>
> A: Yes, it is.

See Tr. 648-49. Warren further described how other E.A.M. members were involved in the plan to kill Harris. See Tr. 640. For example, Campbell — who did not personally know Harris or any specific details about the rivalry between Harris, Warren, Corbett and the defendant — testified that he knew that Warren wanted Harris dead and told another E.A.M. member to be on the lookout for Harris. See Tr. 1155-57. And on the night Warren shot Harris, Qawon Allen — another E.A.M. member — told Warren where to find Harris and the location of a hidden gun so that Warren could use it to kill Harris. See Tr. 650-51.

After Warren shot and paralyzed Harris, Warren called the defendant and told him that he (Warren) had shot Harris. See Tr. 651-52. That same night, Warren met up with the defendant, Allen, and Corbett to discuss what he had done. Id. In response, the defendant told Warren, "that's what I'm talkin' about" and explained that he (the defendant) was already planning on shooting Harris but that Warren had shot Harris first. See Tr. 652-57. The defendant further told Warren that Allen had called him earlier that night to alert the defendant of Harris's whereabouts, but the defendant had been busy at the time. See Tr. 656-57.

Other evidence corroborated many aspects of the cooperating witnesses' testimony. For example, documents recovered from Warren and Campbell's phones that described E.A.M.-specific oaths and salutes in which members swore loyalty to one another and defend one another by shooting their enemies; paperwork documenting the internal hierarchy of E.A.M. and identifying the defendant as one of the leaders of E.A.M; and notes about E.A.M. meetings and members who participated in those meetings. See, e.g., GX 1003 (identifying "Chucky", "Ace" and "Heado" on the "W.W. Lineup" for E.A.M); GX 1005 (example of E.A.M salutes); GX 1102 (notes from Campbell's phone documenting EAM meetings).

Evidence in the form of the defendant's own statements further established his guilt at trial. For example, on two prior occasions, the defendant admitted to others that he was part of the Bloods — in 2007, he told Rikers employees that he was a member of the Bloods and in 2008, he self-identified as E.A.M. See GX 601. The evidence also included photographs obtained from the defendant's own phone depicting the defendant with Campbell and other members of E.A.M. at a gang meeting in July 2019 — the same meeting where the defendant indicated that he was going to be the new leader of the New York Bloods. See GX 1222A-H; Tr. 1100-1102. The jury read numerous text communications between the defendant and other known members of E.A.M. about the gang and its internal affairs. As one example, the jury saw text messages in which the defendant ordered Rizzo (the same E.A.M. member to whom the defendant supplied crack cocaine) to get a "physical" (see GX 1201) and ordered Campbell to go to Attica's prison facility to relay messages to "Ace" — another high-ranking member of E.A.M. (see GX 1206, GX 1003), which confirmed Campbell's testimony. Other text messages clearly demonstrated that the defendant regularly sold drugs such as marijuana to others – exactly as the cooperating witnesses described. See GX 1013, GX 1211, GX 1302; Tr. 1163-64.

2. Possession of Firearms In Furtherance of Drug Trafficking (Count Two)

The evidence at trial also proved the defendant guilty of Count Two. As described above, the trial evidence established that the defendant sold drugs on A-Block and carried a firearm on him "all the time." See Tr. 30-02. Warren testified that the defendant stashed guns in various places on A-Block and at a house on Van Siclen Avenue so that he and other E.A.M. members could use them to protect the drug turf and retaliate against rivals. Tr. 301-303, 573-74; see also Tr. 1161 (Campbell also testifying that he saw the defendant making marijuana at the house depicted in GX 216A). Specifically, Warren testified:

> Q: How about with respect to the defendant, how frequently was he on A block?
>
> A: That was his block. He was there every day.
>
> Q: What did he do there every day?
>
> A: Sell drugs.
>
> Q: Did he also carry a firearm?
>
> A: Yes, all the time.
>
> Q: Did you personally see that?
>
> A: Yes, I did.
>
> Q: Did he store weapons on A block?

7

      A:      Yes, a lot.

      Q:      Where?

      A:      In the building, he stashed one in the mailbox, in a red mailbox, at Ju's house, in the alleyway, behind the grass, across the street in the trap house. Then it was a building. We used to put a gun in that mailbox and there was guns, like three floors that guns used to be there too.

See Tr. 302.

Warren further explained that guns were stashed and shared amongst E.A.M. members so that they could use them to protect themselves and the gang when they needed to. For example, he testified to the following:

      Q:      Why did you have firearms on you when you sold drugs?

      A:      For protection, for anybody that try to violate us, try to come to our block, sells drugs. This is our strength.

See Tr. 303-04; see also 377, 520 (explaining that there were guns stashed in many places because "selling drugs or being part of a gang . . . you always have rivals, you always have people that rob you, disrespect and we always got to keep our respect"). Photographic evidence corroborated Warren's testimony, including photographs showing that one of the buildings on A-Block where the defendant hid guns was the same building where the defendant shot Bullock. See GX 59; GX 62; Tr. 302.

      B.      The Defendant's Post-Arrest Conduct

The defendant's criminal activity did not stop after his arrest. For example, on January 25, 2023, the government received a letter from a Bureau of Prisons Representative regarding the defendant. The letter stated that, on November 22, 2023, the defendant was observed in a fight with another inmate and "[responding] staff observed inmate Smothers with a sharpened metal object in his hand, at which point they issued verbal orders for him to relinquish the weapon, which he ignored." An investigation conducted by security staff at BOP concluded:

> Inmate Smothers was recently released from the Special Housing Unit moments before the [November 22, 2023] altercation. Inmate Smothers has been released from the Special Housing Unit on October 29, 2022, and assaulted another inmate once he released, and during that interview it was determined that Smothers is <u>assaulting random inmates</u> to return to SHU and upon release he has been asking to be sent to a certain unit to be housed with his Co-Defendants. This essentially was the case for this [November 22, 2023] incident also.

(emphasis added).

8

II.  Victim Impact and Restitution

Damian Bullock and Kayne Harris are entitled to restitution, but they have not provided any Affidavit of Loss. PSR ¶ 143.

III. Guidelines Calculation

The government agrees with Probation's calculation that the base offense level for the defendant is 41. PSR ¶¶ 62-88. The government further agrees that the defendant's criminal history category is V. PSR ¶ 97. Based upon a total offense level of 41 and a criminal history category of V, the guideline imprisonment term on Count 1 is 360 months to life. PSR ¶ 131. The mandatory term of imprisonment for Count 2 is for years, to run consecutive to Count One. USSG § 2K2.4(b).

III. Argument

The government submits that a Guidelines sentence of 35 years' to life imprisonment is sufficient, but not greater than necessary, to achieve Section 3553(a)'s purposes. Such a sentence appropriately weighs the extraordinary gravity of the defendant's conduct, the need for deterrence and the need to protect the community from the defendant.

It is settled law that a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 49-50 (2007) (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) the need for the sentence imposed —

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

The nature and circumstances of the instant offenses, see 18 U.S.C. § 3553(a)(1), are extremely serious. The defendant participated in a decade-long reign of terror, ordering and himself participating in life-altering violence and narcotics distribution. The defendant shot his own friend (Bullock) over a gang narcotics dispute, which resulted in Bullock losing his leg.

For years, E.A.M. terrorized the streets of Brooklyn. They waged war against their rivals, shooting, killing, and violently assaulting those who crossed them. They funded their gang enterprise by selling crack cocaine and marijuana, by doing credit card scams. They did all of this in the name of E.A.M. The defendant led this violent gang. He used guns. And

9

through E.A.M., he turned East New York into his own shooting range. He attempted to turn the neighborhood of East New York into what he called "gun town," at great harm and risk to its residents. To make things even more clear, the defendant referred to his own crew as "homicide town."

As set out in the PSR, the defendant has a lengthy history of firearms activity dating back to 2007. The defendant's consistent involvement in serious criminal activity over this period demonstrates his unwillingness to obey the law even following prior punishments. The defendant's significant criminal history paired with his criminal conduct in this case unquestionably warrants a Guidelines sentence.

In the defendant's sentencing memorandum (ECF Dkt. No. 424 ("Def. Mem.")), the defendant expresses no remorse for his actions and primarily argues that his conduct is the result of his life circumstances. Indeed, the defendant's request for a "(1) day" sentence on Count One shows that the defendant still refuses to accept responsibility for his actions. Were he released, he would be capable of continuing to commit crimes, and if his history is any guide, he almost certainly would continue to commit crimes. This makes clear that incapacitation is warranted.

V.  Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence that is sufficient, but not greater than necessary to achieve the goals of sentencing, see 18 U.SC. § 3553(a)(2), which, in this case, is a Guidelines sentence 35 years' to life imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/
Matthew R. Galeotti
Genny Ngai
Jonathan Siegel
Assistant U.S. Attorneys
718-254-6340

cc:   Clerk of the Court (KAM) (by ECF)
Peter Guadagnino, Esq. (by ECF)
Jennifer Fisher, Supervisory United States Probation Officer (by e-mail)