

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JRS/MRG/GN  
F. #2018R01858

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 19, 2024

By ECF

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Qawon Allen
     Criminal Docket No. 20-213 (KAM)

Dear Judge Matsumoto:

  The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for May 3, 2024 at 11:00 a.m. The government respectfully requests that the Court impose an appropriate sentence to reflect the defendant's conduct in this case and his ongoing criminality.

I.  Background

 A.  The Offense Conduct

  The defendant was a longtime member of the Elite Assassin Millas ("EAM"), a violent street gang that operated in East New York, Brooklyn. See Presentence Investigation Report ("PSR") ¶ 13. As a member of EAM, the defendant dealt drugs, including crack cocaine, and participated in numerous acts of violence. See PSR ¶ 15. In particular, on June 28, 2018, the defendant saw John Doe #2, an EAM rival, and alerted both co-defendant Quandel Smothers and another member of EAM to John Doe #2's location so that John Doe #2 could be murdered. See PSR ¶ 32; Trial Tr. 656-57. The defendant also told the other EAM member where he could find a hidden firearm in order to shoot John Doe #2. See id.[1] After the other EAM member

---

[1]  The defendant disputes providing the location of the firearm. See ECF No. 425 ("Def. Mem.") at 12. This effort by the defendant to minimize his role should be rejected; the testimony from the trial of co-defendant Quandel Smothers establishes that the defendant did, in fact, identify the location of the hidden firearm. See Trial Tr. 649-51; see also United States v.

obtained the hidden firearm, the defendant remained on the phone with the other EAM member to continue to relay information about John Doe #2's location to help the other EAM member locate John Doe #2.  See Trial Tr. 650-51.  After the other EAM member shot John Doe #2, paralyzing him, the defendant picked up the other EAM member and drove him to meet Smothers and co-defendant Tyshawn Corbett, where they all celebrated and where the defendant bragged about his role in the shooting.  See Trial Tr. 651-52.

    B.    Procedural History

The defendant was indicted for his role in this conduct on June 18, 2020.  See ECF No. 1.  At the time of his indictment, he was already imprisoned in connection with an armed robbery he had committed with a separate member of EAM, Jason Mabry, in January 2019.  See United States v. Allen, No. 19-CR-128 (NGG) ("Allen I").

On May 27, 2022, the defendant pleaded guilty to Count Nineteen, charging assault in-aid-of racketeering, pursuant to a plea agreement.  See ECF No. 205.  In connection with that agreement, the government agreed that, "based upon information now known to the Office, it will . . . not seek a combined sentence of imprisonment on Count Nineteen of the Indictment and in United States v. Allen, No. 19-CR-128 (NGG), above . . . 235 months."  Ct. Ex. 1 ¶ 5(b).[2]

    C.    The Defendant's Ongoing Criminal Acts

Following that guilty plea, the defendant used a contraband phone in the MDC to retaliate against a cooperating witness by posting sections of the transcript of the witness's testimony, including a section of his testimony describing the witness's then-current location.  The defendant also posted photographs of the witness, stating that the witness "took the stand against Chuck," i.e., Quandel Smothers, and stated that the witness had "violated" and was disloyal.  In his posts, the defendant made clear that he was posting the testimony to publicize the witness's cooperation, which — as the defendant well knew — put the witness's life in danger.  Screen shots of four of the defendant's posts are shown below.

---

Garcia, 167 F. App'x 259, 260-61 (2d Cir. 2006) (rejecting argument that "the district court improperly considered at sentencing the hearsay testimony of a cooperating witness who testified at the trial of Garcia's co-defendants, in violation of the Confrontation Clause of the Sixth Amendment"); United States v. Agyeman, 63 F. App'x 544, 546 (2d Cir. 2003) ("Judge Chin properly relied on his own knowledge of the extensive record in the trial of Agyeman's co-defendants, at which he presided.").

    2    The defendant claims that he has not breached the plea agreement and requests that the government adhere to the agreement.  The government does not assert that the defendant has breached his plea agreement is itself adhering to the plea agreement by not recommending any particular sentence, let alone a sentence above a combined sentence of 235 months' imprisonment in this case and Allen I.  The Court therefore need not address this issue.



On February 1, 2023, the same day that the defendant posted screenshots of the witness's testimony, the defendant changed his Facebook profile photograph to be a photograph of a man eating a rat, a further effort to call attention to the witness's cooperation. A screenshot of that image, including the date it was made his profile photograph, is shown below.



   These postings are part of a long and ongoing pattern of the defendant's use of contraband phones inside the MDC to harass the witness. On multiple occasions prior to February 2023, going all the way back to 2021, government counsel alerted the defendant's counsel that the defendant was using contraband cellular phones (several of which were seized) to post information about the witness and his cooperation. That conduct has had a serious impact on the witness and his family, making it clear to them that the witness can never safely return to Brooklyn.[3]

   The defendant continued to regularly post on Facebook until his sentencing before Judge Garaufis in <u>Allen I</u> on January 9, 2024, when the government included in its sentencing memorandum a selection of the defendant's recent posts, including one from as recently as January 3, 2024. Thereafter, the defendant made his Facebook account private. A selection of Facebook posts by the defendant from within the MDC between August 2023 and January 2024 is shown below.

---

[3]  As a result of these discussions, the plea agreement in this case contained an agreement that the government would not prosecute the defendant for possession of contraband phones and witness retaliation between April 2021 and February 2022. <u>See</u> Ct. Ex. 1 ¶ 5(a). But even after the plea, the defendant's conduct continued unabated.

















At the sentencing in <u>Allen I</u>, the defendant was sentenced to 84 months' imprisonment, the mandatory minimum sentence. That sentence apparently had no deterrent effect on the defendant. Less than two weeks later, on or about January 22, 2024, the defendant (now using his Instagram account) posted that he had phones available for sale in the MDC for $5,500 a piece. An image of that post is shown below.



The defendant continued posting online from a contraband phone even after he was transferred out of the MDC. On or about March 18, 2024, for example, the defendant posted a video on Instagram showing several baggies and balloons that appeared to be stuffed with drugs that had apparently been secreted within a person's body and that the defendant was now offering for sale. An image from that video is shown below.



II.     Sentencing Guidelines

As set forth in the PSR (¶ 49), and as stipulated to by the defendant in his plea agreement, the defendant's offense level (prior to a reduction for a global resolution) is 37. Pursuant to the parties' plea agreement, the government submits that a one-point reduction for a global resolution is appropriate, reducing the offense level to 36.

In light of the defendant's persistent ongoing criminality, however, the government respectfully submits that no reduction for acceptance of responsibility is warranted. As the Guidelines explain, "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right," and evidence that a defendant accepted responsibility by pleading guilty "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1 note 3. In particular, one factor that a court "may take into account in deciding whether a defendant has accepted responsibility is whether he has voluntarily terminated all criminal conduct." United States v. Fernandez, 127 F.3d 277, 285 (2d Cir. 1997). Thus, "[i]f a defendant commits a second crime after pleading guilty to, and while awaiting sentencing for, a first offense, that is a relevant consideration in denying the acceptance-of-responsibility adjustment in selecting the sentence for that first offense." United States v. Fernandez, 127 F.3d 277, 285 (2d Cir. 1997); accord United States v. Chu, 714 F.3d 742, 747 n.7 (2d Cir. 2013); United States v. Sweeney, 485 F. App'x 468, 471 (2d Cir. 2012); United States v. Foley, 71 F. App'x 889, 891 (2d Cir. 2003). Accordingly, the government

8

submits that the defendant should not receive acceptance-of-responsibility credit and the defendant's offense level should be calculated as 36. See United States v. Warren, No. 22-611, 2023 WL 5971115, at *2 (2d Cir. Sept. 14, 2023) (affirming decision to deny acceptance-of-responsibility reduction where defendant committed additional crimes after guilty plea).

As for the defendant's criminal history category, the PSR calculated that the defendant had 10 criminal history points. See PSR ¶ 65 (as amended by the second addendum). In addition, according to the defendant, the defendant pleaded guilty to another offense in March 2023 (relating to identity theft), yielding an additional point. See Def. Mem. 16. As the defendant also concedes, he was subject to a conditional discharge at the time of the instant offense, resulting in one additional point pursuant to U.S.S.G. § 4A1.1(e). See id.[4] As a result, the defendant has a total of 12 criminal history points, resulting in a criminal history category of V.

The defendant argues that his conviction before Judge Garaufis should not be counted for purposes of his criminal history because, he claims, that conduct is "relevant conduct" to the instant offense. See Def. Mem. 13-14. The defendant is mistaken. The fact that the conduct in both cases involved other members of EAM and that the conduct could have been brought in a single indictment under Fed. R. Crim. P. 8 is irrelevant to the relevant conduct analysis and has no bearing on whether the conduct should receive criminal history points. Rather, as relevant here, for conduct to be relevant conduct, it must have "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). The firearm conviction in Allen I related to a robbery in January 2019 and had nothing to do with the offense of conviction here, the assault in-aid-of racketeering of John Doe #2 in June 2018. Thus, the firearm conviction from Allen I is not relevant conduct and is properly considered as part of the criminal history calculation.

The defendant also claims that two driving related convictions should not be counted. See Def. Mem. 12-13. The Court need not address these disputes, as even if these convictions were not counted, the defendant would still have 10 criminal history points, which would still result in a criminal history category of V. These disputes are therefore immaterial to the Guidelines and need not be resolved. See Fed. R. Crim. P. 32(i)(3)(B) (courts must resolve PSR disputes unless "a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing"); see also United States v. Defeo, 36 F.3d 272, 277 (2d Cir. 1994) (declining to address Guidelines dispute that did not impact Guidelines range); accord United States v. Sanford, 832 F. App'x 77, 79 (2d Cir. 2020).

A Guidelines offense level of 36 and a criminal history category of V yield a Guidelines range of imprisonment of 292 to 365 months. Because the statutory maximum is 240 months, the effective Guidelines range is 240 months' imprisonment. Notably, even if the Court calculated the defendant's criminal history category as IV, his Guidelines range would still be

---

[4] The defendant states that he should receive two points. As a result of recent Guidelines amendments, however, he should only receive one point. See U.S.S.G. § 4A1.1(e).

9

above the statutory maximum (262 to 327 months) and would still yield an effective Guidelines range of 240 months' imprisonment.

 III. Argument

 A. The Sentence Imposed Must Run Consecutively to the Sentence in *Allen I*

The government respectfully submits that whatever sentence the Court imposes in this case should run consecutively to the 84-month sentence imposed in Allen I.

That sentence was for a conviction under 18 U.S.C. § 924(c), and that statute states that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person." 18 U.S.C. § 924(c)(1)(D)(ii). Admittedly, there is a circuit split regarding whether or not that provision requires that a later sentence must run consecutively to a prior § 924(c), and the government has not identified any Second Circuit authority on the issue. Compare United States v. Wright, 33 F.3d 1349, 1350 (11th Cir. 1994) (subsequent sentence must be consecutive), with United States v. Jones, 986 F.2d 42, 44 (3d Cir. 1993) (subsequent sentence may be concurrent). The government, however, submits that it does not make sense for the requirement that a § 924(c) conviction run consecutively to any other sentence turn on which sentence was imposed first. That is especially true here, where it was entirely fortuitous that the sentencing before Judge Garaufis occurred before this sentencing. Indeed, if the order of the sentencings had conclusive effect, that would invite gamesmanship, where defendants would have an incentive to push forward § 924(c) sentencings and delay other sentencings. Thus, as a matter of the plain language of the statute and of common sense, the sentence here must run consecutively to that § 924(c) sentence, regardless of which came first.

In imposing a consecutive sentence, however, the Court may consider the existence of the prior sentence in determining the sentence to impose on the instant offense to craft an appropriate total sentence. See Dean v. United States, 581 U.S. 62, 71 (2017).

 B. The Court Should Impose an Appropriate Sentence

The government respectfully requests that the Court impose an appropriate sentence.

First, the sentence should appropriately take into account the extraordinary seriousness of the defendant's offense. See 18 U.S.C. § 3553(a)(1), (a)(2)(A). Gang violence and gun violence are scourges afflicting the people of this city and people across the nation. Here, the crime committed by the defendant led to tragic results, paralyzing his victim. That conduct had permanent and life changing consequences for John Doe #2 and his family, and similar conduct traumatizes and harms members of the community on an all-too-regular basis. It should not be tolerated.

Second, the sentence should serve the critical need for deterrence and to protect the community from the defendant. See 18 U.S.C. § 3553(a)(2)(B), (C). Unfortunately, the defendant's conduct following his guilty plea in this case demonstrate that the defendant is not

remorseful, has not yet been deterred from continuing criminal conduct, and has not been incapacitated even while incarcerated. He appears to remain actively involved in the Bloods gang — his Facebook and Instagram profile name, Phorty Bugatti, is made up of his nickname "Phorty" and "Bugatti," a term used to indicate membership in a particular set of the Untouchable Gorilla Stone Nation, which falls under the national Bloods umbrella.[5] A significant sentence is therefore necessary both to deter the defendant and to make clear to other gang members and other defendants who may be tempted to retaliate against cooperating witnesses that such conduct has serious consequences.

Third, the sentence should appropriately account for the history and characteristics of the defendant. See 18 U.S.C. § 3553(a)(1). The defendant has a long and troubling criminal history, indicating that prior sentences have failed to deter him and that he has no respect for the law.

The defendant's arguments that the difficult upbringing he faced in East New York mitigate his conduct are entitled to little weight. As the Court is well aware, tens of thousands of people grew up in East New York at the same time as the defendant, and the vast majority of them live honest, non-violent lives. Only a small segment of the community has any involvement in gangs, despite the outsized harm gangs cause, and even within the small population of gang members, the defendant's conduct stands out as particularly insidious. Cf. Corbett Jan. 22, 2024 Sent'g Tr. 69:13-15 ("[T]he vast majority of people who grow up in impoverished communities in East New York and elsewhere, do not engage in the type of criminal activity that has led to Mr. Corbett's sentencing today."). Moreover, the defendant's conduct had terrible consequences for his community, recreating the difficult circumstances he decries. Cf. id. at 69:19-25 ("Mr. Corbett's criminal conduct has a detrimental effect on his community and has contributed significantly to making his community the traumatic and unsafe environment for many others. He has contributed to the tragic outcomes of gun violence. He's contributed to the epidemic of drugs that have negatively impacted the homes and lives of innocent children.").

Our Constitution requires that the community of East New York be given the equal protection of the law from people like the defendant that wealthier and whiter communities already receive. His victims deserve the same justice as any other victims from any other community. The Court's sentence should reflect that equal justice.

---

[5] The defendant was previously a member of the Milla Bloods, who use the identifier "Maserati."

IV.     Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose an appropriate sentence that would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

        Respectfully submitted,

        BREON PEACE
        United States Attorney

By:   /s/ _____
        Jonathan Siegel
        Matthew R. Galeotti
        Genny Ngai
        Assistant U.S. Attorneys
        718-254-6293

cc:    Clerk of the Court (KAM) (by ECF)
       Michael Hueston, Esq. (by ECF)
       Roberta Houlton, United States Probation Officer (by e-mail)